UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE: METHOD OF PROCESSING    )
ETHANOL BYPRODUCTS AND         )
RELATED SUBSYSTEMS ('858)      )    Master Case:   1:10-ml-02181-LJM-DML
PATENT LITIGATION              )    Related Case:  1:13-mc-00058-LJM-DML

## Order on Motion to Quash in Related Case

On June 3, 2013, the District of Connecticut transferred to this court a

motion to quash a deposition and documents subpoena served on CleanTech counsel

Charles O'Brien by defendant Iroquois Bio-Energy Company, LLC in this

multidistrict patent litigation.  The motion has been fully briefed under Related

Case 1:13-mc-00058-LJM-DML.

## Introduction

Five United States patents-in-suit are at issue in this multidistrict patent

litigation, and GS CleanTech Corporation ("CleanTech") is the owner by assignment

of all of them.  David Cantrell and David Winsness are the inventors, either singly

or together, for all of the patents-in-suit.  The patents are:  U.S. Patent No.

7,601,858; U.S. Patent No. 8,008,516; U.S. Patent No. 8,008,517; U.S. Patent No.

8,283,484; and U.S. patent No. 8,168,037.  The first four claim priority to

CleanTech's first patent application, which was filed on August 17, 2004, as a

provisional application.

This MDL includes numerous lawsuits in which CleanTech (usually the plaintiff in the lawsuits) alleges that the defendants[1] are liable for infringement of some or all of the patents-in-suit.   Among the defenses to infringement raised by the defendants is that CleanTech (by its assignors or other representatives) engaged in inequitable conduct in the prosecution of one or more of the patents of a nature that invalidates the patent(s) or makes them unenforceable against the defendants. Briefly stated, the defendants assert that CleanTech made false or misleading disclosures to the United States Patent and Trademark Office ("PTO") or omitted material information with respect to the inventors' interactions in 2003 and 2004 with a company called Agri-Energy.  The defendants maintain that Mr. O'Brien, one of CleanTech's litigation counsel in these cases, has information relevant to this defense because he participated in the decisions about what to disclose to the PTO and when to disclose it, and because he drafted certain of those disclosures. CleanTech argues that the court should not permit his deposition or require production of the requested documents, primarily based on its position that the defendants have had appropriate discovery on these matters and that their inequitable conduct defense is a non-starter.

　　　To determine the propriety of the discovery the defendants seek, the court must examine the contours of the inequitable conduct defense—both to address CleanTech's argument that the defense fails on the basis of facts already developed and to identify whether discovery from CleanTech's counsel is relevant.  In its 2011

---

[1]    For simplicity, though not technically accurate, the court will refer to CleanTech as the plaintiff and the defendants collectively as the alleged infringers in all the cases in the MDL.

decision in *Therasense, Inc. v. Becton, Dickinson and Co.,* 649 F.3d 1276 (Fed. Cir. 2011), the Federal Circuit Court of Appeals opined that the common law inequitable conduct defense had become overused, abused, improperly expanded, and "an absolute plague." *Therasense* announced new and tougher standards to govern the defense.

The inequitable conduct defense, which must be shown by clear and convincing evidence, requires proof that "the patentee acted with the specific intent to deceive the PTO." *Id.* at 1290. When the defense focuses on nondisclosure—as it does at least in part here—there must be clear and convincing evidence that the patentee "*made a deliberate decision* to withhold a *known* material reference." *Id.* (emphasis in original). Intent and materiality are separate elements and, generally, the defense is limited to cases where the alleged misconduct resulted "in the unfair benefit of receiving an unwarranted claim." *Id.* at 1292. Thus, "but-for" materiality of the withheld information must nearly always be shown: the alleged infringer must show that if the PTO had been aware of the withheld information, it would not have allowed a claim. *Id.* at 1291-92. Only where there is "affirmative egregious misconduct," is proof of but-for materiality not necessary. In that circumstance, the patentee's egregious acts to deceive the PTO serve as a proxy for materiality because "a patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes that the falsehood will affect issuance of the patent." *Id.* at 1292.

As noted above, the inequitable conduct defense in this case centers on the inventors' interactions in 2003 and 2004 with a company called Agri-Energy.   Peter Hagerty, one of CleanTech's patent counsel, has testified that another attorney at his firm, Charles O'Brien, participated in the drafting of, and decision-making regarding, disclosures to the PTO about the inventors' interactions with Agri-Energy.  Mr. O'Brien has appeared as litigation counsel for CleanTech in this MDL, and Mr. Hagerty's testimony reveals that Mr. O'Brien was involved in submissions to the PTO made during this litigation.  The defendants assert that documents in Mr. O'Brien's possession or control and testimony from him are reasonably necessary to prove inequitable conduct.

CleanTech (and Mr. O'Brien) contend that the defendants have been afforded sufficiently wide-ranging discovery to support their theory of inequitable conduct (documents discovery from the patentees and inventors, except for those for which privileges were asserted, depositions of the two inventors, and depositions of two lawyers who were, successively, lead patent prosecution counsel for the patents-in-suit).   CleanTech argues that the evidence demonstrates that the defendants cannot prove, or even come close to proving, the elements of the defense required by *Therasense,* and that it would be wasteful and unfair to permit the defendants to depose and obtain documents from Mr. O'Brien, one of their litigation counsel.

As explained below, the court finds that the defendants have demonstrated that information they seek from Mr. O'Brien is relevant and cannot be, or has not been, obtained from another source.  It also determines that discovery related to the

4

defense cannot be foreclosed on the basis of the evidence already developed.  But the court also finds that the document requests directed to Mr. O'Brien are overbroad and must be narrowed.  In addition, though the parties briefly allude to privilege issues that will inevitably arise, none has briefed the attorney-client privilege and work product issues that they can reasonably anticipate in connection with Mr. O'Brien's document production and deposition testimony.  The court will require the parties to do so in short order so that the court will be in a position to rule on these issues as they arise.

<u>Analysis</u>

### I.   Interactions with Agri-Energy[2]

As noted above, the '858 patent family (consisting of the '858, '516, '517, and '484 patents) claim priority to a provisional patent application filed on August 17, 2004.  Under the patent laws, generally, if a patent application is filed more than one year after an offer of sale of the invention, then the invention is deemed to have entered the public domain and is not entitled to patent protection.  *See* 35 U.S.C. § 102(b).  One of the inventors, David F. Cantrell, wrote a letter he dated July 31, 2003, to a representative of Agri-Energy "offer[ing] a No-Risk trial 'Oil Recovery System,'" at the end of which Agri-Energy would either purchase the system for $423,000 or return it to the company with which Mr. Cantrell was affiliated at the

---

[2]   The background described in this section is based primarily on facts the defendants say they intend to prove at trial.  These are not factual findings by the court.

time, Vortex Dehydration Technology, LLC.  *See* Dep. Ex. 104, Master Dkt. 193-2 at pp. 5-6.

According to the court's understanding, CleanTech made three disclosures to the PTO regarding interactions with Agri-Energy:  a disclosure in June 2009 concerning feasibility testing in May 2004; a Supplemental Response in November 2010 that included the First Cantrell Declaration; and the Second Cantrell Declaration in July 2012.

*Feasibility Testing*

In June 2009, after it learned from the PTO that the '858 patent would be issued on June 23, 2009, CleanTech filed a Request for Continued Examination. One stated purpose of the RCE was to inform the PTO that in May 2004, "feasibility testing of a process and system for recovering oil from thin stillage was performed. . . ." Although this disclosure did not name Agri-Energy, the reference to testing in May 2004 was to testing at Agri-Energy's facility.  *See* Hagerty Dep. Trans. at pp. 146-151, Misc. Dkt. 11-29.

CleanTech did not disclose, however, testing involving Agri-Energy that occurred in the June/July 2003 period, nor did it disclose the existence of diagrams or drawings of the oil recovery system that apparently were prepared in this same period.

*November 2010 Disclosure and First Cantrell Declaration*

On November 9, 2010, CleanTech submitted to the PTO a Supplemental Response to augment an Information Disclosure Statement dated November 8,

6

2010.  Those submissions disclosed information about a letter dated July 31, 2003, from inventor David Cantrell to Jay Summers of Agri-Energy ("Letter") and about Mr. Cantrell's interactions with Agri-Energy.  The Supplemental Response was submitted after CleanTech had received a notice of allowance for the '516 patent but had requested the PTO to reopen its prosecution of that patent for the submittal of additional information, including the Supplemental Response.  Hagerty Dep. Trans. at pp. 170-171.

The Supplemental Response consists of the Declaration of David F. Cantrell (the "First Cantrell Declaration") and a summary of the testimony provided in that declaration.  Mr. Cantrell swore in that declaration that although he dated the letter July 31, 2003, the first time he delivered the July 31 Letter was on August 18, 2003 (on the 365th day of the one year on-sale bar), when he hand-delivered the Letter in a face-to-face meeting with Agri-Energy's representatives at Agri-Energy's facility in Minnesota.  The declaration goes to great lengths to document Mr. Cantrell's activities on August 17, 18, and 19, 2003 (with copies of airline and hotel receipts), apparently in an effort to quell any doubt that Mr. Cantrell's "hand delivery of the Letter at this meeting on August 18, 2003 was the first time that the Letter was shown to Agri-Energy."   First Cantrell Declaration, ¶ 11.  The Supplemental Response also states that the Letter is not material because "the

Letter was not delivered to Agri-Energy prior to August 17, 2003"—thus, not delivered within the one year on-sale bar.  Supp. Response at p. 3.[3]

Mr. Cantrell's deposition was taken in this litigation in September 2011. During questioning, he was confronted with an email sent by him on August 1, 2003, to Mr. Summers and Mr. Gerald Winter of Agri-Energy, Mr. Winsness (his co-inventor), and Mr. Mark Lauderbaugh (a person who was assisting Mr. Cantrell with marketing), to which was attached the July 31 Letter.  CleanTech's counsel, who was also defending Mr. Cantrell's deposition, instructed Mr. Cantrell not to answer any questions about the document because the document had not been

---

[3]     Earlier in 2010—on July 27, 2010—one of CleanTech's litigation counsel had written to counsel for Agri-Energy requesting that Agri-Energy provide a statement regarding its interactions with Mr. Cantrell during 2003 and 2004, including confirmation that (a) the system offered by Mr. Cantrell in July 2003 was experimental and confidential, (b) no drawings or diagrams of the system were provided, and (c) no specific method for recovering corn oil was described, except that the system included a disc stack centrifuge.  The July 2010 letter also stated that Agri-Energy's provision of this statement would not result in any liability and would resolve any issues that CleanTech has with Agri-Energy.  *See* Iroquois Brief, Misc. Dkt. 11 at pp. 10-11.  The hoped-for statement from Agri-Energy was not provided and its principal, Jay Summers, now states that he did not provide such a statement because it would have been untrue.  *Id.*  The statements in this letter that CleanTech wanted Agri-Energy to confirm are similar to CleanTech's position in the context of the present motion and in this litigation generally that the July 31, 2003 Letter cannot, in any event, be construed as an offer of sale.  The court has not endeavored to determine whether CleanTech can show as a matter of law that the inventors' interactions with Agri-Energy, including the July 31, 2003 Letter, do not satisfy the on-sale bar.  A motion directed to that issue has not been filed or briefed. But it appears that in November 2010 when CleanTech filed the Supplemental Response with the PTO, it was concerned that the July 31 Letter could be construed as evidence of the making of an offer of sale within one year, which is why the First Cantrell Declaration contains such detailed support for Mr. Cantrell's statement that he did not deliver the Letter until August 18, 2003.

produced before the deposition.[4]  The deposition was then concluded for the day and was not reconvened for many months because of health issues asserted by Mr. Cantrell.  When Mr. Cantrell's deposition was resumed in April 2012, Mr. Cantrell stated that he questioned the legitimacy of the email because he could not recall having sent it, and that he believed his credit card receipts provided a better time line of his interactions with Agri-Energy.  Cantrell April 2012 Dep. Trans. at pp. 294-297, Misc. Dkt. 11-15.

***July 2010 Second Cantrell Declaration***

CleanTech waited until July 2010 (about nine months after Mr. Cantrell's first deposition) to tell the PTO of the existence of the August 1 email.[5]  CleanTech's disclosure was a four paragraph declaration by Mr. Cantrell (the "Second Cantrell Declaration"), which states in relevant part:

1. Attached is an e-mail sent from my e-mail account on August 1, 2003 to Jay Sommers of Agri-Energy, LLC and copied to Mark Lauderbaugh of Trident Corporation, Gerald Winter of Agri-Energy, LLC and David Winsness, co-inventor of the present application ("the August 1st email"), which attached a version of a letter dated July 31, 2003 (the "July 31 Letter").

2. At the time that I signed a Declaration dated November 5, 2010 that was submitted to the United States Patent and Trademark Office in the

---

[4]    Based on a public statement made by defendant ICM and perhaps based on other information, CleanTech's counsel suspected that the defendants intended to spring new documents on Mr. Cantrell without having yet produced them as they were required to do.  The court previously addressed the defendants' failure timely to produce the August 1 email and the inappropriate instruction to Mr. Cantrell by CleanTech counsel not to answer questions.  *See* Master Dkt. 204.

[5]    In addition to the timing issues pertinent to this order, that wait is inconsistent with CleanTech's suggestion that the defendants' failure timely to produce the August 1 email materially affected CleanTech's ability to make disclosures to the PTO regarding the inventors' interactions with Agri-Energy.

following related cases:  App. Serial Nos. 12/559,136, which issued into US Patent 8,008,517 and 11/241,231, which issued into US Patent 8,008,516, I did not recall the August 1st email.

3.  The July 31 Letter attached to the August 1 email was unsigned.

Misc.  Dkt. 13-5.

The defendants view the timing and content of the Second Cantrell Declaration as part of a deliberate plan to obfuscate the materiality of the August 1 email.  CleanTech was aware of the August 1 email no later than Mr. Cantrell's September 2011 deposition, which was taken during CleanTech's prosecution of the '484 Patent.  The '516 and '517 patents had issued in August 2011, before the deposition.  Just before Mr. Cantrell's deposition, CleanTech had received the PTO's first office action on the application that led to the '484 Patent.  It responded to that office action on February 10, 2012, but did not then inform the PTO about the August 1 email (or about other interactions between the inventors and Agri-Energy during June and July of 2003).  Hagerty Dep. Trans. at pp. 201-202.  In April 2012, CleanTech received a notice of allowance for the '484 patent.  *Id.* at p. 203. Sometime thereafter, it filed a petition to withdraw the application from issuance and a request for continued examination, presumably for the purpose—at least in part—of providing the August 1 email to the PTO. *Id.* at pp. 203-204.

When the defendants asked patent prosecution counsel Peter Hagerty in his deposition to explain why he chose not to tell the PTO about the August 1 email during active prosecution of the '484 Patent or in CleanTech's response to the first office action, he refused to answer the question based on instructions from

CleanTech's litigation counsel (who represented Mr. Hagerty at his deposition) not to reveal Mr. Hagerty's "impression or strategies." *Id.* at p. 202.

According to Mr. Hagerty, the Second Cantrell Declaration was written by Mr. O'Brien, whom he described as having prepared or having helped to prepare the declaration with some input from Mr. Hagerty and "involvement" by Mr. Cantrell. *Id.* at 205.  Mr. Hagerty also testified that Mr. O'Brien had played a lead role in drafting the First Cantrell Declaration.  *Id.* at p. 173.  In addition, Mr. Hagerty consulted with and relied on Mr. O'Brien to assist him in making decisions about the prosecution of the patents and to provide him with information from the litigation that should be filed with the PTO.  *Id.* at pp. 31-32.  Mr. Hagerty also testified that he disclosed to the PTO all documents that *he* received concerning the inventors' interactions with Agri-Energy.  *Id.* at p. 117.  Thus, to the extent that information and documents regarding Agri-Energy were not disclosed to the PTO, one reasonably may infer that the decisions regarding their disclosure were made by members of the litigation team, including Mr. O'Brien.  Further, based on Mr. Hagerty's testimony regarding Mr. O'Brien's role in the drafting of both Cantrell Declarations, one also may infer (on the present record) that he played a lead role in deciding the timing and contents of disclosures to the PTO regarding Agri-Energy. That includes not only disclosure of the May 2004 testing and the two Cantrell Declarations, but also decisions regarding the disclosure of testing that occurred,

and diagrams or drawings that were prepared, in or around June and July 2003, that apparently also are related to Agri-Energy.[6]

## II.   The defendants are entitled to additional discovery surrounding the decision-making regarding the Agri-Energy disclosures to the PTO.

The court is persuaded that the evidence, or inferences that may reasonably be drawn from the evidence, surrounding CleanTech's and the inventors' disclosures and omissions from disclosure to the PTO regarding Agri-Energy justify additional discovery.  The court rejects CleanTech's arguments that discovery should be denied because the July 31 Letter as a matter of law cannot be deemed material or because CleanTech's submission of the Second Cantrell Declaration cured, as a matter of law, any deceptive effect of the First Cantrell Declaration.  The court determines instead that the defendants should be permitted additional discovery to pursue their theory of a deliberate plan to deceive the PTO regarding the significance of contacts with Agri-Energy.

The court finds that because of Mr. O'Brien's participation in the prosecution of the patents through his apparent roles in providing information to Mr. Hagerty, drafting the Cantrell declarations, his testimony regarding disclosures (or non-disclosures) of the inventors' various interactions with Agri-Energy, and the testing and diagrams from the June/July 2003 period, is relevant to the defendants' proof of the inequitable conduct defense.

---

[6]    It is at least the defendants' theory that the June/July 2003 testing and diagrams help to prove that the July 31 Letter properly should be understood as an offer for sale within the one-year on-sale bar.

In fact, the heightened standards of *Therasense* make inquiry into counsel's and client's patent prosecution decisions—and the knowledge base underlying them—a natural avenue of discovery.  Indeed, that sort of inquiry will often be unavoidable when the accused infringer must supply clear and convincing evidence of specific intent to deceive or of a deliberate decision to withhold material information.  For example, in a post-*Therasense* decision, the Federal Circuit, in evaluating the evidence regarding inequitable conduct, described testimony by patent prosecution counsel regarding the reasons he did not disclose a reference that he knew about and which could be considered material.  The court commented that there was nothing in the record indicating that a deliberate decision was made to withhold the reference, such as a letter from patent prosecution counsel to the client regarding the subject reference.  *1st Media, LLC v. Electronic Arts, Inc.,* 694 F.3d 1367, 1375 (Fed. Cir. 2012).  The court also noted that the accused infringers admitted at oral argument that they had taken full discovery on the inequitable conduct defense and had informed the court that the record was complete.  *Id.* at 1377.  *See also General Elec. Co. v. Mitsubishi Heavy Industries, Ltd.,* 2013 WL 2338345 at *5 (N.D. Tex. May 28, 2013) (district court found that the assertion of the attorney-client privilege prevented it from fully judging the inequitable conduct defense, and noted the belief that the court's hands "are tied by the Federal Circuit's post-*Therasense* precedent, and without more conclusive documentation of a deliberate conspiracy, there can be no finding of inequitable conduct"); *Medicines Co. v. Mylan, Inc.,* 2013 WL 1283480 (N.D. Ill. March 19, 2013) (ruling that under

principles of express and implied waiver, defendants were entitled to documents and testimony relating to decisions not to disclose issue to PTO). The court does not see why information disclosed (or not disclosed) to the PTO becomes irrelevant when it is supplied or edited by litigation counsel.

The court's citations to these cases is not intended to express its views on the extent to which the attorney-client privilege or the work product doctrine may or may not limit the production of documents by Mr. O'Brien or questions he may be required to answer in his deposition. The parties' briefing of the present motion does not effectively assist the court in determining those issues. The court will require the parties to submit supplemental briefing regarding the application of the attorney-client privilege and work product doctrine, including specifically whether the work product doctrine may be invoked to shield discovery of "impressions or strategies" in decision-making regarding disclosures to the PTO in the patent prosecution context.[7] In this vein, the court expects the parties to address the effect of Mr. O'Brien's dual role in participating in disclosures and the decisions regarding disclosures to the PTO  and in his acting as litigation counsel—a dual role chosen by Mr. O'Brien or his client. The parties are directed to file briefs simultaneously regarding the privilege and work product issues no later than August 6, 2013. Each may file a response to the other side's brief by August 13, 2013.

---

[7] The court notes here that Mr. Hagerty refused to answer questions about his decision-making or strategies in connection with disclosures to the PTO about Agri-Energy. *See* Hagerty Dep. Trans. at pp.116 and 202. The parties have not yet addressed whether or how the work product doctrine has application in the context of patent prosecution.

III.    **Any inquiries must be limited to disclosures regarding Agri-Energy and decision-making regarding them.**

Testimony by Mr. O'Brien and any documents that he must produce will be limited to those reasonably necessary for the defendants fairly to explore decision-making regarding the disclosures or omissions from disclosure to the PTO regarding the inventors' interactions with Agri-Energy in 2003 and 2004, including their connection to the 2003 testing and diagrams or drawings prepared or existing at that time.  The court finds that the documents described in the subpoena to Mr. O'Brien are far more broad than reasonably necessary.  For example, the court will not require Mr. O'Brien to produce all documents relating to prosecution of the patents-in-suit, or all documents relating to communications with Applicants regarding the patents-in-suit, or all documents relating to Agri-Energy, or all documents relating to efforts to obtain information from Agri-Energy in 2010, or drafts of the First or Second Cantrell Declarations.  The court does not, by this list, approve of the other categories of documents described in the subpoena.  Instead, the court will require the defendants to substantially revise and limit their document requests, and will require the defendants to demonstrate how and why each limited request is reasonably necessary to a fair understanding of Mr. O'Brien's participation in and decision-making regarding  disclosures or omissions from disclosure to the PTO regarding Agri-Energy.   The defendants must submit to the court their revised document requests, and a brief demonstrating the necessity

of those requests, simultaneously with their opening brief on the attorney-client and work product issues.[8]

## Conclusion

For the foregoing reasons, the court GRANTS in PART and DENIES in PART CleanTech's motion to quash the deposition subpoena served on attorney Charles O'Brien. The court permits the defendants to take Mr. O'Brien's deposition and to seek documents from him, but limited to Mr. O'Brien's participation in and knowledge regarding decision-making about disclosures or omissions from disclosure to the PTO about the inventors' interactions with Agri-Energy in 2003 and 2004, including testing and diagrams and drawings conducted or prepared in 2003. The plaintiff and defendants (collectively) must file by August 6, 2013, supplemental briefs addressing the application of the attorney-client privilege and the work product doctrine, and they each may file a response brief by August 13, 2013. In addition, the defendants (collectively) must file by August 6, 2013, their proposed revised document requests along with a brief demonstrating the reasonable necessity of those requests. The plaintiff may file a response brief by August 13, 2013. The court will then determine the categories of documents that

---

[8]     The court is aware that the defendants have also served a documents and deposition subpoena on attorney Michael Rye. The parties have advised the court that a motion to quash the subpoena has been filed in the District of Connecticut, and that District may transfer the motion to this court. A transfer has not yet occurred. The court anticipates that a decision regarding the propriety of a deposition of Mr. Rye may depend on the information Mr. O'Brien provides in discovery.

must either be produced or scheduled on a privilege log in advance of Mr. O'Brien's

deposition.

So ORDERED.

Date: _____07/23/2013_____

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email generated by the court's ECF system